# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>*1617 JFK Blvd, Suite 520*<br>*Philadelphia, PA 19103*<br><br>                              **Plaintiff,**<br><br>                **v.**<br><br>XUE SAMUEL LEE,<br>  a/k/a "Sam" LEE,<br>   *573 Glen Huntly Road*<br>   *Elsternwick, VIC 3185, Australia[1]*<br><br>**and**<br>BRENDA INDAH CHUNGA,<br>  a/k/a "Bitcoin Beautee,"<br>   *336 Sherer Lane, Severna Park, Anne*<br>   *Arundel County, MD 21146[2]*<br><br>                     **Defendants.** | CIVIL ACTION NO. 24-cv-00296<br><br><u>**COMPLAINT**</u><br><br><br>**JURY TRIAL**<br>**DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission" or the "SEC") files this Complaint against Defendants Xue Samuel Lee a/k/a "Sam" Lee ("Lee") and Brenda Indah Chunga a/k/a "Bitcoin Beautee" ("Chunga"), and alleges as follows:

## <u>SUMMARY</u>

1.      This case involves a global, crypto asset-related, multi-level marketing pyramid and Ponzi scheme that raised over $1.7 billion from victims worldwide, including millions from U.S. investors.  Defendants and others operated the scheme through a series of projects referred to collectively herein as "HyperFund."

---

[1] The address for Defendant Lee reflects his last known address in Australia.  As indicated *infra*, we believe Defendant Lee currently resides in Dubai, United Arab Emirates.

[2] The address for Defendant Chunga reflects her known address during the actions set forth in the Complaint.  Ms. Chunga can be reached through her counsel:  Jonathan P. Van Hoven, 36 South Charles Street, Suite 901, Baltimore, MD  21201.

2.      The HyperTech Group, a purported blockchain technology conglomerate founded by Lee and others (collectively, the "Founders") launched HyperFund in June 2020.  At the outset, HyperFund claimed to be a project dedicated to creating a so-called "decentralized finance (DeFi) ecosystem" for crypto asset market participants.  Over time, the project's stated goals evolved and utilized various names in an effort to capitalize on the buzz words and zeitgeist of the day, including rebranding itself as "HyperVerse" and, later, as "HyperNation," a version of the project which featured an individual in a mask discussing creating a decentralized government to escape the societal bonds of inequality and injustice through blockchain technology.  HyperFund, including its subsequent rebranded iterations, is now defunct.

3.      From June 2020 through May 2022, HyperFund offered so-called "membership" packages promising exorbitant passive returns, supposedly derived in part from HyperFund's crypto asset mining operations.  For example, HyperFund promised returns of 0.5% to 1% per day, with the prospect of tripling ones' initial investment in 600 days.  HyperFund also implemented a pyramid scheme-like referral system to reward existing members for recruiting new investors.

4.      HyperFund's membership packages were offered and sold as investment contracts, and therefore, securities under the federal securities laws, because investors made an investment of money in a common enterprise with a reasonable expectation of profits from the efforts of Defendants or third parties.  The membership packages were offered and sold without registration, and without qualifying for any exemption from registration.

5.      Lee was centrally involved with HyperFund throughout its lifecycle.  Lee was a co-founder of HyperTech Group, which claimed to be involved in "Large Scale Crypto Mining," including bitcoin, that promoters asserted was a key revenue source for HyperFund.  However,

2

Lee later admitted that HyperTech Group was not engaged in large-scale bitcoin mining.  Lee was also featured prominently during HyperVerse's launch event, and he even claimed to be helping to resurrect HyperVerse after its collapse, as a way of recouping investor losses.

6.     Chunga (known online by her nickname "Bitcoin Beautee") was one of HyperFund's top promoters and arguably the face of its United States presence.  Chunga's recruitment efforts through online seminars and videos included the typical promotional ruses associated with fraudulent multi-level marketing schemes.  Here, that included focusing on investors' supposed ability to make money via daily passive rewards, and also via so-called "accelerated" rewards if investors convinced others to join.  Chunga's pitch was successful.  Within six months, Chunga earned the highest level a HyperFund promoter could achieve, which, according to promotional materials, required at least $5 million in new investments, which were referred to as "sales," and she continued to generate additional new investments long after that.  Chunga received over $3.7 million, both from the platform and directly from investors.  She used her earnings to fund extravagant personal expenses and help recruit others into the scheme by showing off the potential wealth to be earned through HyperFund.

7.     HyperFund, however, was a pyramid and Ponzi scheme.  HyperFund had no real source of revenue other than funds received from investors, and Defendants had no basis for the promised returns.  HyperFund did not engage in large-scale crypto asset mining, despite the claims by promoters like Chunga that the investors' passive rewards were being paid by such efforts.  HyperFund even hired an actor to pretend to be the new CEO when HyperVerse was launched.  With no apparent legitimate source of revenues, investor withdrawals were paid with new investor deposits.

8.      Chunga ignored red flags about HyperFund and made several misrepresentations to investors to convince them to join.  Lee knew or recklessly disregarded that the presentations used by the promoters, like Chunga, included false statements.  Lee also made statements to investors that were misleading by omitting material information about the nature of the business.  Ultimately, the scheme collapsed in 2022 when investors were no longer able to make withdrawals.

9.      From approximately June 2020 to approximately November 2022, Defendants (1) raised millions of dollars from retail investors in the United States, and several other countries, through the unregistered offer and sale of securities styled as membership interests in HyperFund; and (2) made materially false and misleading statements about the investments and knowingly or recklessly engaged in a scheme to defraud investors—bilking the investors out of over $1.7 billion—by enticing them with the false promise of guaranteed, high returns from investments in securities.

## JURISDICTION AND VENUE

10.      The Court has subject matter jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); and Sections 21(d) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa(a).

11.      The Court has personal jurisdiction over Defendants and venue is proper in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because, among other things, Chunga resided and/or listed her legal residence in Maryland for all or a substantial portion of the time she was engaged in promoting the scheme, many of the Defendants' acts and transactions constituting

violations of the Securities Act and the Exchange Act occurred in this District, and many of the harmed victim investors resided in this District during the relevant time.

12.    In addition, this Court has jurisdiction because some or all of the Defendants engaged in conduct within the United States that constituted significant steps in furtherance of the violations of the federal securities laws alleged in this Complaint.

13.    In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, the mails, and/or the facilities of a national securities exchange – namely, through the Defendants' use of the Internet when engaging in the acts and transactions described herein.

## DEFENDANTS

14.    **Xue Samuel Lee a/k/a Sam Lee**, age 35, an Australian national, resides in Dubai, United Arab Emirates.  In addition to HyperFund, Lee purports to be the co-founder and CEO of Blockchain Global Ltd., which is part of the HyperTech Group conglomerate.  Lee has never been associated with a registered entity and has no disciplinary history with the Commission.

15.    **Brenda Indah Chunga a/k/a/ "Bitcoin Beautee,"** age 43, resided in Severna Park, Maryland during the relevant period.  Chunga has never been associated with a registered entity and has no disciplinary history with the Commission.

## RELATED ENTITIES

16.    **Group Limited** (the "HyperTech Group") was incorporated on April 1, 2020, in the Seychelles, and purportedly operated in Hong Kong.  HyperTech Group was advertised in multiple promotional videos made public during the relevant period as a conglomerate of four

5

blockchain companies controlled by Lee and others:  Blockchain Global Ltd., HyperCash (formerly known as Hcash), CollinStar Capital, and DigitalX.  In or about June 2020, HyperTech Group launched HyperFund.  HyperTech Group was featured in presentations as the business experience and expertise behind the project to give HyperFund credibility for prospective investors and was advertised as the alleged source of the rewards investors earned.

17.     **HyperFund** is the name of the multi-level marketing project launched by HyperTech Group in June 2020 that claimed to be building a so-called decentralized finance ecosystem.  HyperFund was subsequently rebranded to HyperVerse in or about December 2021, and then rebranded to HyperNation in or about May 2022.

## FACTS

### A.     Chunga and Lee Offered and Sold Securities Through HyperFund

#### The Global Launch of HyperFund

18.     On June 11, 2020, in a press release issued through a paid service, the HyperTech Group announced that it was launching HyperFund.  The press release billed HyperFund as an "upgrade of HyperCapital," a similar multi-level marketing project one of HyperFund's Founders attempted to launch six months earlier, in January 2020.

19.     The press release described Lee as the founder and Chairman of HyperFund and listed Lee as the "contact" for inquiries.

20.     In the press release, Lee was quoted as saying that the upgrade reflected a change in the strategic focus and development plans of the company.  The press release claimed HyperFund would be "more streamlined and better equipped to handle the challenges and opportunities in the traditional finance and cryptocurrency market" and would have three key focus areas: tech incubation, investment and funding, and community building.

21.     The press release also claimed that HyperTech Group planned to be listed on the Hong Kong Stock Exchange by 2022 and that it intended to launch products such as HyperNews, HyperTalk, and HyperShow, supposedly blockchain-based social networking platforms.

22.     The presentations Chunga later used to recruit investors similarly prominently featured these and other details about the Founders, including Lee, and the entities that purportedly comprised the HyperFund Group on slides that were labeled "Credibility," including slides featuring screenshots of Lee appearing on CNN and other media outlets.  One of the details Chunga touted was the fact that Lee and another one of the Founders were featured and interviewed in an episode of an Amazon Prime documentary series called "Next: Blockchain."

23.     In one presentation, Chunga leveraged HyperFund's Founders' public-facing profiles in order to persuade investors that there was no risk in investing with the HyperTech Group:

> Some people say things, how do we know they won't just take our money and disappear?  Well, ladies and gents, they have more to lose than to gain. They're all over CNN.  They have publicly traded companies, they are on Amazon Prime, their faces are everywhere.  They have more to lose than to gain.

24.     As Chunga emphasized in other presentations: "[L]adies and gents, **this is not a company that needs your money. . . .  He doesn't need us.**"  (emphasis added).

25.     On information and belief, Lee was not only a co-founder of HyperFund, but he maintained control over HyperFund throughout its existence.  Lee's background and role as co-founder of HyperFund was a prominent feature of the marketing and promotional materials used by promoters to attract new investors.  Lee was aware or recklessly disregarded that HyperFunds's marketing materials used to recruit investors contained material misstatements because he admitted as much during a call with an investor.  Lee also recorded a message that was released as part of the launch of HyperVerse in December 2021, and later appeared in video-

teleconference calls with promoters and others to attempt to assuage the concerns of HyperFund's investors.

HyperFund's "Membership Rewards" Program

26.     Investors purchased "memberships" in HyperFund at various levels using the crypto asset Tether (USDT).  For example, in her HyperFund videos, Chunga encouraged investors to "Choose Your Membership" level:  $300, $500, $1,000, or $10,000.  Typically HyperFund promoters, including Chunga, gave a link to investors through which the investors would use Tether to purchase the package.  On the HyperFund platform, the value of the individual's membership level was reflected in the form of an internal value called HyperUnits, or HU.  For example, a $300 membership was reflected as 300 HyperUnits.

27.     Chunga told investors who purchased a membership that they would receive:  (1) access to a crypto asset educational platform; (2) exclusive pre-sale offerings of future crypto asset projects, such as, initial coin offerings ("ICOs") at 20%-30% below market value; and (3) automatic returns on their investment, which were called "rewards."

28.     HyperFund offered two ways for members to make money:  passive rewards, which promised investors a daily return of 0.5% to 1% of the value of their investment until they earned triple the value of their initial investment, and leveraged or accelerated rewards.

29.     As Chunga explained in a promotional video recorded on or about February 9, 2021, "[Y]ou will receive your initial membership in 6.5 months, lets round it up to 7 months. . . You now have your initial investment amount back in your pocket.  And then what happens after that?  Everything else that's coming to you every day after that, what is that?  That is pure profit. You did not have to work for it."

30.     According to Chunga, "here, with HyperFund, your money is doing all of the work for you and you don't even have to get out of bed."

31.     Investors could supposedly also earn "accelerated" rewards by recruiting new investors which promoters, like Chunga, encouraged HyperFund investors to do.

32.     HyperFund offered three types of leveraged rewards:  Community Rewards, VIP Rewards, and Global Rewards.  First, with respect to Community Rewards, Chunga explained in her presentations that, in exchange for building the community by referring HyperFund to friends and family, HyperFund would supposedly pay investors 20% of their downline's membership value every day up to 20 levels.  HyperFund's "COMMUNITY REWARD" program was detailed in this illustration from a presentation recorded on or about March 9, 2021 and posted to YouTube:





## UNILEVEL REWARDS

### COMMUNITY REWARD
(PAID DAILY)

**Example:** Your directs get a total of **10,000HU** per day. You get rewarded **2,000HU** daily, or **20%** of those rewards **+ 1-15%** from levels 2-20!

| # OF DIRECTS | LEVEL | REWARD % |
|---|---|---|
| 1 | 1 | 20% |
| 2 | 2 | 15% |
| 3 | 3 | 10% |
| 4 | 4 | 5% |
| 5 | 5 | 5% |
| 6 | 6 | 5% |
| 7-15 | 7-15 | 2% |
| 16-20 | 16-20 | 1% |

33.     Second, the VIP Reward provided further incentive to recruit more investors. As Chunga explained:

> The company says in your team, in your group, if you guys have $50,000 in membership sales outside of your largest team, we're going to give you an additional half-a-percent every single day on top of everything else they've been giving you.  They also said, if you make it to Pro, which is $100,000 in membership in your entire team, they are going to now pay you an additional one

percent every single day through infinity . . . of your entire organization minus
your largest leg.

34.    HyperFund's VIP Rewards Program is illustrated in this presentation recorded on

or about February 9, 2021 and posted on YouTube:



35.    Third, highly successful recruiters also supposedly qualified for Global Rewards,

which were to be paid monthly.  HyperFund claimed that under the Global Rewards program,

HyperFund took 4% of all company sales—in other words, pooled the funds—and divided them

among its top promoters.  As a "VIP 5 STAR," which is the highest level a promoter could

achieve, Chunga qualified for Global Rewards.

36.    Chunga frequently encouraged investors to increase their membership value by

reinvesting their rewards through so-called "rebuys" instead of withdrawing them, including in

the March 9, 2021 presentation recorded and posted on YouTube.

37.     HyperFund's structure further discouraged withdrawals.  The only way to withdraw the rewards was to convert the internal HyperUnits to so-called "Molecular Future" (MOF)—a crypto asset issued, in part, by another founder of HyperFund ("Founder B")—and then transfer the MOF from the HyperFund platform to the HOO Exchange, which was a digital asset platform also purportedly owned by Founder B of HyperFund.  From there, the investor would need to convert MOF to other crypto assets and transfer them out of the HOO Exchange in order to exchange them for fiat currency.

38.     Although the so-called HyperUnits were reflected on the HyperFund platform as being pegged at $1 when an investor deposited money (*e.g.*, a $300 membership was equal to 300 HyperUnits), that was not the case when the HyperUnits were withdrawn after being converted to MOF.  In other words, the conversion of HyperUnits to MOF was not pegged $1 USD, or any price for that matter, because MOF was a crypto asset that actively traded and, as such, its price fluctuated.

39.     Currently, MOF does not appear to be actively traded, and as of September 4, 2023, the last day for which at least one crypto asset platform has price data on MOF, it was quoted at $0.00001949 USD.  Thus, attempts to withdraw funds generally would have been far less than the "face" value that HyperFund and Chunga claimed.

Chunga Profited from HyperFund

40.     Another HyperFund promoter recruited Chunga into HyperFund on or about September 28, 2020.  Chunga invested approximately $5,000 in HyperFund through this other HyperFund promoter and invited people to join presentations hosted by others.

41.     In late 2020 and early 2021, Chunga began to host her own presentations, which were periodic Zoom calls on which she narrated PowerPoint slide decks she obtained from the

HyperFund website.  Many of these presentations were recorded and publicly posted on YouTube and Vimeo around the time the presentations were made.  Chunga eventually became one of only six "corporate" presenters for HyperFund, and one of only two in the U.S.  Chunga knew, or was reckless in not knowing, that these presentations contained materially false and misleading statements and omissions.

42.     Chunga was successful at recruiting people to invest in HyperFund.  In one of her early videos, Chunga claimed to have generated $1 million in new investments in HyperFund in only six weeks.  By March 31, 2021—only approximately six months after she joined HyperFund—Chunga reached the level of "VIP 5 STAR," which was the highest level a HyperFund promoter could achieve and required at least $5 million in "sales."

43.     Between September 2020 when Chunga joined HyperFund and approximately March 2022 when the HyperFund platform stopped permitting withdrawals, Chunga withdrew approximately $2.5 million from the HyperFund platform.

44.     In addition to those withdrawals, however, Chunga also took money directly from HyperFund investors.  Chunga often accepted U.S. currency directly from investors who transferred funds to her personal bank account via check or wire.  In exchange, Chunga either transferred Tether to the investor for the investor to send to HyperFund or she transferred HyperUnits to the investor from one of her own HyperFund accounts.  For these "services," Chunga charged the investor a fee of between 1% and 3%.  Chunga received an additional approximately $1.1 million by accepting funds directly from HyperFund investors.

45.     In addition, after Chunga reached VIP 5 STAR status, HyperFund paid Chunga's rewards at a higher rate, but she could only withdraw 0.25% per day.  At that point, transferring

her HyperUnits to new investors for cash they deposited with Chunga facilitated her withdrawal of funds from HyperFund.

46.     Collectively, through withdrawals from the HyperFund platform and by taking funds directly from HyperFund investors, Chunga received approximately $3.7 million.  Among other things, Chunga spent that money on a lavish birthday party that doubled as a HyperFund recruitment event, as well as expensive custom-made jewelry and clothing, a BMW, designer handbags, a $1.2 million home in Severna Park, Maryland, and a $1.1 million condominium in Dubai.

47.     Although Chunga's ill-gotten gains were considerable, she embellished them further to recruit investors.  For example, in October 2021, she wrote to a prospective investor: "I'm making over 5 million a year with my one crypto platform and I've helped 7 people make 2 million and 100's make 6 figures within the past 10months.  So whenever your [sic] ready I'll give you the blueprint."  The investor later followed up asking for a link for HyperFund. However, Chunga statements were false.  She did not actually make $5 million through HyperFund, as she knew or recklessly disregarded.

**B.     <u>The Rebrandings and Collapse of HyperFund</u>**

<u>HyperFund to HyperVerse</u>

48.     In the fall of 2021, HyperFund rebranded itself as HyperVerse.  HyperVerse was officially launched on December 5, 2021.  Part of the new HyperVerse narrative was that the HyperTech Group was creating a virtual world to connect people in the HyperVerse Ecosystem, which you would enter using your virtual avatar.

49.     During this launch event, which took place live online and was recorded and then made available publicly online, HyperVerse presented a new supposed CEO of HyperVerse,

"Steven Reece Lewis."  In a recorded video played during the launch event, Lewis thanked everyone for their participation and for giving him "the chance to share more about HyperVerse, our operations, and future direction . . . . "  After repeatedly invoking a prominent social media company's rebranding, "CEO Lewis" explained that HyperVerse offered a "virtual world" with "new business opportunities" and the development of a crypto asset, characterized as a "native token," called "HVT."  In reality, the person presented as Lewis was an actor playing a role of a fabricated character.  He was not the CEO of HyperVerse.

50.     As with HyperFund, Lee was still at the forefront of the management of the new HyperVerse iteration.  Lee knew, or was reckless in not knowing, that the person presented as Lewis was not actual Steven Lewis and was not the actual CEO of HyperVerse.

51.     The launch event also featured a recording of statements by Lee wherein he introduced himself as the CEO and founder of Blockchain Global and Chairman of the HyperTech Group; discussed his background, including being one of the first miners of bitcoin; and explained that the advent of "metaverse" was a "new way of having everyone participate and be a creator."  Lee closed by saying that it was, "very exciting to be a part of a team to provide my knowledge to this ecosystem and I look forward to a great 2022."

52.     HyperVerse presentations posted online and presented on Zoom attempted to tie the project directly to the metaverse and discussed creating an avatar to live inside a new virtual financial world.

53.     Mechanically, the back-office transition from HyperFund to HyperVerse appears to have been automatic for HyperFund investors, though the HyperFund website itself was disabled and investors were required to use the new HyperVerse website.

54. The HyperVerse 1.0 rewards program made similar promises to HyperFund—one could supposedly earn 0.5% per day up to three times your initial investment in 600 days. It also offered "a university-level blockchain education."

55. When HyperVerse 2.0 was launched in or about April 2022, the membership package changed to supposedly earning 0.3% per day up to four times your initial investment, but it would now take 1,333 days to reach that goal instead of 600.

56. Notably, in or about November/December 2021, during the transition process from HyperFund to HyperVerse, investors were experiencing difficulties withdrawing their rewards. By February/March 2022, investors were not able to make withdrawals at all. Promoters attempted to explain away the withdrawal problems as technological issues with the new HyperVerse back-office platform.

HyperVerse to HyperNation.

57. In late May 2022, HyperVerse was rebranded as HyperNation. The new narrative claimed that blockchain technology would help to combat inequality and injustice in HyperNation's new decentralized government. The narrator was a person in a hooded suit wearing black gloves and a gold mask who called himself "Mr. H."

58. In HyperNation, the membership packages were labeled as so-called "non-fungible tokens" or "NFTs," with each membership level represented as a different colored "NFT" box: Yellow; Green; Purple; and Platinum. Investors could use a limited percentage of their HyperVerse rewards to purchase the NFT, but they would be forced to surrender the rest of the previously-earned rewards. And to transfer an investors' multi-level marketing "downline" from HyperVerse to the HyperNation platform, the investor was required to buy the $10,000 so-

15

called NFT.  On September 30, 2022, HyperNation announced to investors that Chunga was

appointed to be the HyperNation Sales Manager for the U.S.

<u>The Collapse of HyperFund.</u>

59.     The challenges HyperVerse investors had withdrawing funds in February/March

2022 were never resolved.

60.     In June 2022, the HOO Exchange announced it had suspended withdrawals from

HyperVerse after receiving a heavy volume of withdrawal requests and stated that it intended to

restart transactions within 72 hours.

61.     While it is not clear if investors were able to make withdrawals after the

announced 72-hour window, by November 2022, the HOO Exchange stopped working

altogether, which effectively ended HyperFund as that was the only possible way HyperFund

investors could make withdrawals.  Investors were not able to redeem investments after

November 2022.

62.     From inception to collapse, HyperFund raised over $1.7 billion worldwide.

<u>Subsequent events</u>.

63.     Lee continued to be centrally involved with HyperFund in all of its iterations—

even after it collapsed.

64.     In early 2023, Lee began appearing on videos with former HyperFund

promoters to meet with HyperFund investors who were expecting to learn details about

the recovery plan for them to receive their "1x" (i.e., their initial investment amount).

65.     In July 2023, Lee appeared on a video with a former HyperFund promoter

announcing he was planning to rebuild HyperVerse—in his words—"For realz this time!  For

realz this time!"

66.     To date, it does not appear as though Lee has relaunched HyperVerse.

**C.    Defendants Disseminated Material Misrepresentations In Connection with the Offer and Sale of HyperFund Memberships**

67.     While the very nature of HyperFund was a fraud in which the entity lacked any reasonable basis to pay the promised returns, many of the specific representations proliferated by HyperFund and repeated by Chunga and others used to lure investors to join HyperFund were also false.  These false representations were statements regarding, among other things:  (1) HyperFund's supposed affiliation with DigitalX; (2) Lee's success with Blockchain Global and its ties to HyperFund; (3) HyperFund's affiliation with IBM; (4) revenue generated from large-scale crypto asset mining; and (5) HyperVerse CEO "Steven Reece Lewis."

                        HyperFund's affiliation with DigitalX

68.     The slide decks that HyperFund created that Chunga and others used to promote HyperFund prominently featured DigitalX, a company that provides access to crypto assets to wholesale investors, as one of the four companies that comprised the HyperTech Group conglomerate.  One example of HyperFund's claimed affiliation with DigitalX is the following slide which appeared in a presentation Chunga recorded on or about January 16, 2021[3]:



---

[3] The upper right portion of the image was redacted to remove Defendant Chunga's image.

69.     Indeed, in the same January 16, 2021 presentation that featured this slide, Chunga said: "The HyperTech Group is comprised by four amazing, successful companies.  The first company is Digital X . . . **Our company owns . . . DigitalX** . . . ." (emphasis added).

70.     However, the HyperTech Group was not in fact affiliated with Digital X and, on February 15, 2021, DigitalX disavowed any association with the HyperTech Group by issuing a "Notice of non-affiliation with HyperTech Group and its directors, related entities and affiliates." Specifically, DigitalX stated:

> DigitalX has recently become aware that HyperTech Group Co Ltd and/or its directors, related entities and affiliates, is using the DigitalX brand to promote and/or provide digital asset management products and services to global consumers over the internet, through such websites as hypertechgrp.com, hypertechtrading.wordpress.com, youtube.com and facebook.com.  **DigitalX is not affiliated, associated, or connected with HyperTech Group Co Ltd in any way**, or any of its directors, related entities, affiliates, businesses or products (including HyperFund Global, [and] the HyperCommunity ….  (emphasis in original).

<u>Lee's success with Blockchain Global and its ties to HyperFund</u>

71.     Repeatedly in presentations throughout 2021, promotional materials generated by HyperFund and used by Chunga touted HyperFund's strong connection with Blockchain Global, the Australian company Lee founded and served at as CEO.  During the HyperVerse launch event on or about December 5, 2021, Lee introduced himself as the CEO of Blockchain Global.

72.     In HyperVerse presentations that followed, Chunga continued to stress the connection with Blockchain Global and why this connection supposedly gave credibility to the HyperFund project and increased the safety of the investment.  For example, during a promotional video recorded on or about December 13, 2021, while displaying a PowerPoint slide titled, "Credibility," Chunga discussed Blockchain Global's:

> [P]artnerships with governments and Fortune 500 companies around the world, they established a $300 million plus fund to assist over eighty blockchain

projects.  Now, why are they doing that?  Because their goal is to spread the right message, to do things the right way, and educate the masses.  So who wouldn't want to align themselves with people who truly want to educate the masses on our future?

73.     In reality, as reported in a November 2021 article, Blockchain Global had entered "voluntary administration" (a self-administered restructuring procedure), owing creditors a reported $21 million, an estimate that was later increased to approximately $50 million.  The article stated that Lee had "stepped down as a director" in March 2019.

### HyperFund's affiliation with IBM

74.     Materials used to promote HyperFund also touted that the last of the four entities that comprised the HyperFund Group—Hcash—was engaged in "Quantum Resistant Security projects with IBM."  Chunga featured this alleged relationship prominently during her presentation, including presentations she made after the transition to HyperVerse.  In a presentation she gave on February 9, 2021, Chunga told investors: "Our next successful entity is Hcash . . . They focus on quantum resistance, we're talking strictly about quantum computers. They're one of the fastest computers in the worlds.  They are working alongside IBM." However, IBM was not involved with Hcash.

### Revenue generated from large-scale crypto asset mining

75.     Chunga anticipated investors asking how HyperFund could pay rewards every day.  The slide decks Chunga used to promote HyperFund addressed this issue.  One of the purported sources of the funds to fuel the daily rewards was the HyperTech Group's "Large Scale Crypto Mining."





76.     In a presentation recorded on or about January 16, 2021, Chunga explained the

mining operations to prospective investors as follows:

> It means our owner has warehouses upon warehouses that mine crypto. And when
> we say, mine crypto, we're not just talking about bitcoin, we're talking about the
> cryptocurrencies that are out here, the top 20: you're talking Ethereum; you're
> talking TRON; you're talking -- there are so many, USDT, so many different
> cryptocurrencies that they're mining.  Again, this is one way revenue is coming
> into the HyperTech Group.

77.     In another presentation, Chunga emphasized that large-scale crypto asset mining

not only happened in real time, but claimed they were making so much money doing it that the

rewards would keep flowing:

> And now today, ladies and gents, he does it on a large scale.  What does that
> mean?  Large scale simply means he has warehouses all around the world that's
> constantly mining crypto, constantly, around the clock.  So just that alone is
> bringing in millions, without us. That's without us.

78.     However, in a recorded audio call a HyperFund investor had with Lee in early

2023, Lee admitted that the HyperTech Group exited the bitcoin mining business in 2019—

which was long before HyperFund was even launched in the U.S.—and that they did so because

"mining's not profitable."  Lee explained:

> From 2019 onwards, all we did was sell shovels.  We didn't even own one single
> machine, because it just doesn't make any sense.  In a bull market, the mining
> machines are overpriced, in a bear market they're worthless. Alright?  And there
> is no gauge to make sure that you're able to guarantee profit, unless you have free
> electricity, which no one in this world has.

79.     Further, Lee admitted that he knew the representations the promoters, like

Chunga, were making about the HyperTech Group's bitcoin mining activities were false:

> … a lot of the narrative that was promoted to the HyperCommunity is inaccurate
> because, sure, it was great demonstrating that, yeah, we were the fourth largest
> miner in the world, you know, but it -- does it mean anything when we had to sell
> all our bitcoins for a couple hundred dollars just to pay electricity?  The answer is
> no.  Right?  (Laughs).

80.     Despite knowing that the HyperFund promoters' representations about large

scale-crypto asset mining were false, Lee allowed the representations to continue and did not

alter the messaging made available for HyperFund presentations.

### HyperVerse CEO "Steven Reece Lewis"

81.     As noted above, in the fall of 2021, HyperFund rebranded to become HyperVerse.

During the December 5, 2021 launch of HyperVerse, they unveiled a new CEO—"Steven Reece

Lewis"—who delivered a speech during the launch event.

82.     In her HyperVerse presentation, Chunga walked through Lewis's resume,

including highlighting that he started his career as a derivatives trader at a prominent investment

bank.

83.     According to this investment bank, there is no record of a "Steven Reece Lewis"

ever being a derivatives trader at the firm.  The individual featured as "Steven Reece Lewis" was

really a paid actor who worked as a "TV presenter working alongside international businesses, helping front their products and services," and resides in Bangkok City, Thailand.

## HYPERFUND'S MEMBERSHIPS WERE SECURITIES

84.     The HyperFund memberships are investment contracts and therefore securities pursuant to Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.  An investment contract involves:  (1) the investment of money; (2) in a common enterprise; (3) with a reasonable expectation of profits to be derived from the efforts of others.  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).

85.     HyperFund memberships were typically offered and sold in exchange for money in the form of the crypto asset called Tether.  Additionally, some investors purchased HyperFund memberships by paying Chunga in fiat currency—i.e., the U.S. dollar.

86.     HyperFund membership investments were investments in a "common enterprise." All HyperFund membership investors' funds were pooled by HyperFund, and each HyperFund membership investor at the same "rewards level" was to be paid pro rata returns in direct proportion to the number of HyperFund memberships purchased, in the form of fixed interest payments or "rewards".

87.     HyperFund membership investors were led to expect profits from purchasing the HyperFund membership and those profits were to be derived from the efforts of third parties— HyperFund and its agents.  Specifically, in promotional materials and elsewhere, HyperFund and its promoters like Chunga promised that HyperFund would use investor proceeds to operate a large-scale crypto asset mining venture from which investors would passively earn their profits (or "rewards").  Although the investors could earn leveraged or accelerated rewards through the optional referral program, HyperFund promoters emphasized that investors could remain passive

to earn rewards, and that these rewards would be stable specifically because of the work of others, including HyperFund's supposed large-scale crypto asset mining, among other things.

## UNREGISTERED SALE OF SECURITIES

88.     Sections 5(a) and 5(c) of the Securities Act require that an issuer like HyperFund register the offer or sale of securities with the SEC.  Similarly, those provisions prohibit individuals, like Chunga and Lee, from engaging in unregistered offers or sales of securities.

89.     No registration statement was in effect or had been filed as to the offer or sale of HyperFund memberships, which were securities.

90.     Defendants, directly or indirectly, offered or sold HyperFund memberships, through the use of interstate facilities or the mails and interstate commerce.

91.     Defendants' offers and sales of HyperFund memberships did not qualify for an exemption from registration.

92.     Chunga violated Section 5 by playing an integral role in the distribution of HyperFund memberships.  For example, she used social media to publicize and promote HyperFund memberships and actively recruited investors into purchasing HyperFund memberships through periodic Zoom presentations, and directly sold memberships to investors, including by providing interested investors with referral links and by directly accepting proceeds from investors.

93.     Lee violated Section 5 by playing an integral role in the distribution of the HyperFund memberships.  As a founder, Lee created and launched HyperFund.  Importantly, the descriptions of his business experience and media appearances that appeared in the slide decks of PowerPoint presentations during the Zoom presentations used to recruit investors were critical elements of the offers and sales of HyperFund memberships.

94.     Lee's appearance and speech during the launch of HyperVerse was an offer of securities.  Lee's reputation and public-facing crypto asset persona deceived investors into believing that HyperFund was not a scam because it was backed by a known crypto asset entrepreneur.  Those details were used to add legitimacy and credibility to the scheme, and to convince investors that their money was not only safe, but that the money they expected to make was coming from purportedly legitimate sources.

## **THE DEFENDANTS VIOLATED THE ANTIFRAUD PROVISIONS**

95.     Lee, as one of the Founders of HyperFund, knew, or was reckless in not knowing, that HyperFund did not generate revenue sufficient to be able to reasonably expect to meet its payment obligations to investors, other than income generated from the sales of new HyperFund memberships, and therefore was a Ponzi scheme.

96.     Lee knew, or was reckless in not knowing, that HyperFund could not reasonably expect to generate the returns that the HyperFund membership promotional materials promised investors, including the returns promised via the so-called "rewards program," which was nothing but a pyramid scheme recruiting tool.

97.     Lee's role in the HyperFund membership scheme was critical, from its inception to long after its collapse.  Lee was a co-founder of HyperFund and was, marketed to investors as a key aspect of the enterprise.  In presentation slides labeled "Credibility," HyperFund detailed Lee's purported various roles and accomplishments, suggesting an investment in HyperFund was a good idea because Lee was the architect.

98.     Lee's involvement did not stop there.  Lee was a prominently featured speaker for the launch of HyperVerse—the supposed rebrand of HyperFund after its first collapse—on or about December 5, 2021.  And again Lee's role was key:  as a founder, his presence allowed the

24

HyperFund scheme to transition to HyperVerse with continuity.  During this speech, Lee made at least two statements that were misleading because he omitted certain key facts.

99.    Lee touted his business prowess by introducing himself as the CEO of Blockchain Global.  At that time, however, that statement omitted information that would have been material to investors given the context in which it was made—namely, Blockchain Global had ceased business operations, a fact Lee knew or recklessly disregarded.  Lee also failed to mention that he stepped down from Blockchain Global as a director, and that the company no longer had any operations.

100.    Moreover, during the HyperVerse launch speech, Lee also specifically discussed his purported success as one of the first miners of bitcoin, not only as an illustration of his business acumen, but also seemingly as a parallel to suggest that the opportunity the rebranded HyperVerse presented to investors was just as big as investing in bitcoin.  However, despite raising his supposed experience in bitcoin mining, Lee failed to add that HyperTech Group's large-scale mining operations ended in 2019, as Lee again knew or recklessly disregarded, and as reasonable investors would have wanted to know in the context of Lee touting his supposed bitcoin mining prowess.

101.    Lee's statements were particularly misleading for two reasons.  First, he knew prospective HyperFund memberships investors were told by HyperFund that the large-scale mining operations and the revenues from Blockchain Global were sources of the passive rewards they would receive.  Second, he knew the purportedly robust viability of those business operations were used to imply that because HyperTech Group had numerous independent revenue streams, it was not a scam.  Indeed, Chunga punctuated this message in her presentations

by saying "they have more to lose than to gain," and "this is not a company that needs your money."

102.    Lee closed his December 5, 2021 speech by emphasizing his direct involvement in HyperVerse, saying that it was "very exciting to be a part of a team to provide my knowledge to this ecosystem and I look forward to a great 2022."

103.    After HyperFund's total collapse, Lee was the only founder who surfaced on videos with promoters, including Chunga, teasing investors with the hope of a possible recovery plan.

104.    Lee obtained money through HyperFund, including, but not limited to, approximately $140,000 sent to a digital wallet in Lee's custody or control in a series of transactions occurring on or about or between February 23, 2023 and May 8, 2023.

105.    Chunga, as one of the top U.S. promoters, knew, or was reckless in not knowing, that HyperFund was being promoted through misleading statements and false promises.

106.    Chunga ignored numerous red flags about HyperFund.  For example, in March 2021, the United Kingdom's Financial Conduct Authority ("FCA") issued a scam warning regarding HyperFund, a warning Chunga knew about or recklessly disregarded.

107.    In December 2021, Chunga also learned that Blockchain Global—one of the companies that was purportedly feeding revenue into the HyperFund project—had collapsed. Yet, even as late as March 2022, after HyperFund rebranded to HyperVerse, Chunga was still touting Blockchain Global as part of the project's "credibility."

108.    In December 2021, Chunga learned about an online article labeling HyperFund as a Ponzi scheme.  Chunga ignored it.

109.     Chunga ignored withdrawal issues regarding HyperFund when investors raised them to her (which occurred with regularity during the relevant period), and especially when those challenges became more significant starting in November/December 2021.

110.     As alleged above, Defendants raised funds from retail investors in the United States and across the world through the unregistered offer and sale of securities—HyperFund memberships.  In connection with the offer and sale of those securities, the Defendants engaged in a scheme to defraud investors and further engaged in practices that operated as a fraud or deceit upon those investors.  To date, HyperFund raised over $1.7 billion.

111.     Defendants knew, or were reckless in not knowing, that their statements about HyperFund's returns and profits were materially false and misleading.  Defendants further knew, or were reckless in not knowing, that they were operating a scheme to defraud investors in HyperFund's securities.

## FIRST CLAIM FOR RELIEF
### Unregistered Offers and Sales of Securities in Violation of
### Sections 5(a) and 5(c) of the Securities Act
### (Against Both Defendants)

112.     The Commission repeats and realleges Paragraphs 1 through 111 of its Complaint.

113.     The offer and sale of HyperFund memberships was an offer and sale of securities.

114.     Defendants directly or indirectly, singly or in concert,

    (a)     made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect;

    (b)     for the purpose of sale or for delivery after sale, carried or caused to be

carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and/or

(c)     made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

115.     By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

**SECOND CLAIM FOR RELIEF**
**Fraud in Violation of Section 17(a) of the Securities Act**
**(Against Both Defendants)**

116.     The Commission repeats and realleges Paragraphs 1 through 111 of its Complaint.

117.     By engaging in the conduct described above, Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, knowingly, recklessly, or negligently,

(a)     employed one or more devices, schemes or artifices to defraud;

(b)     obtained money or property by means of one or more untrue statements of material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)      engaged in one or more transactions, practices or courses of business which operate or would operate as a fraud or deceit upon a purchaser.

118.     By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF
**Fraud in Violation of Section 10(b) and Rules 10b-5 of the Exchange Act**
**(Against Both Defendants)**

119.     The Commission repeats and realleges Paragraphs 1 through 111 of its Complaint.

120.     Defendants directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly,

(a)      employed one or more devices, schemes, or artifices to defraud;

(b)      made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)      engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

121.     By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## **RELIEF REQUESTED**

**WHEREFORE**, the Commission respectfully requests that the Court find the Defendants committed the violations alleged and enter a final judgment:

### **Permanent Injunctions**

Permanently restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from directly or indirectly violating the federal securities laws alleged in this Complaint; and further permanently restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from directly or indirectly (1) offering, operating, or participating in any marketing or sales program in which the participant is compensated or promised compensation solely or primarily for (a) inducing another person to become a participant in the program; or (b) if such induced person induces another to become a participant in the program; and (2) participating directly or indirectly in any offering of crypto asset securities; provided, however, that, such injunction shall not prevent Defendants from purchasing or selling crypto asset securities for their own personal accounts.

### **Disgorgement and Prejudgment Interest**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations, pursuant to Section 21(d)(3), (5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d), (5) and (7)].

**Civil Penalty**

Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)]; and Section 21(d)(3) of the Exchange Act [15 U.S.C. §

78u(d)(3)].

**Further Relief**

Granting any other and further relief this Court may deem just and proper.

**Retention of Jurisdiction**

Further, the Commission respectfully requests that the Court retain jurisdiction over this

action and Defendants in order to implement and carry out the terms of all orders and decrees

that it may enter, or to entertain any suitable application or motion by the Commission for

additional relief within the jurisdiction of this Court.

**Demand for Jury Trial**

The Commission hereby demands a trial by jury on any and all issues in this action so

triable.


Dated: January 29, 2024                    Respectfully submitted,

                                           */s/Judson T. Mihok*
                                           Judson T. Mihok
                                           U.S. District Court of Maryland Bar No. 92737
                                           Gregory R. Bockin
                                           David Snyder
                                           Assunta Vivolo
                                           Attorneys for Plaintiff
                                           U.S. SECURITIES AND EXCHANGE
                                           COMMISSION
                                           Philadelphia Regional Office
                                           1617 JFK Boulevard, Suite 520
                                           Philadelphia, PA 19103
                                           Phone: 215-597-6500
                                           Fax: 215-597-2740
                                           Email: MihokJ@sec.gov